UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
RBFC ONE, LLC,

                        Plaintiff,          02 Civ. 3231(DFE)

        - against -                         OPINION AND ORDER

ZEEKS, INC. d/b/a *NSYNC,
JUSTIN RANDALL TIMBERLAKE,
CHRISTOPHER ALAN KIRKPATRICK,
JAMES LANCE BASS,
JOSEPH ANTHONY FATONE, JR.,
JOSHUA SCOTT CHASEZ,

                        Defendants.
----------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

        The Second Amended Complaint made claims for breach of
contract and fraud.  Defendants move for summary judgment
dismissing all of Plaintiff's claims.  Defendants previously
counterclaimed for breach of contract; Plaintiff moves for
summary judgment dismissing the counterclaims.

        Factual and Procedural Background

_____Plaintiff, generally known as Really Big Film Corp., is
engaged in the business of producing motion pictures, especially
in giant-screen format, and also digital video disks ("DVD") and
ancillary products.  (Second Amen. Compl. ¶ 5.)  In early 2000,
Really Big Film Corp. was a California corporation called RBFC
Inc.; on September 6, 2000, it assigned its contract rights to a
Nevada limited liability corporation called RBFC One, LLC.
(Defs.' 56.1 Statement ¶ 6.)

        Defendant Zeeks, Inc. is a Delaware corporation "that owns
the *NSYNC trademark and the rights to the services of the
musical group *NSYNC."  (*Id.* ¶ 2.)  Defendants Timberlake,
Kirkpatrick, Bass, Fatone, and Chasez comprise *NSYNC, and have
often been referred to as members of "the Band."  (*Id.* ¶ 3.)

        The parties negotiated a written contract dated "as of June
14, 2000," and signed it a few weeks later (the "Original

                                -1-

Agreement"). Pursuant to the Original Agreement, Plaintiff acquired the right to create a 45-minute film, in giant-screen format, entitled "*NSYNC Bigger Than Live," to consist of footage from live *NSYNC concert performances to be filmed in June and July 2000. Plaintiff agreed to bear sole responsibility for all costs and distribution of the film. The parties agreed to a percentage division of the film's gross revenues.

The Original Agreement gave Plaintiff a license only for theaters outside the United States. It gave Plaintiff the right "to distribute and exhibit the Film only in giant screen theaters for a period of two years (the 'License Period') from the date of the Film's first public exhibition which will not be later than October 20, 2000[.]" (Orig. Agreement ¶ 8.)

Plaintiff completed the shooting of the film and the editing of the visual portion on October 2, 2000. Its subcontractor (a company called Iwerks) completed a "first pass" editing of the sound portion on October 10, 2000. [1] At that point, the parties negotiated to (a) add the United States to the license territory, and (b) extend the deadline past October 20, 2000. The result was the Amended and Restated Agreement (the "Amended Agreement"), which replaced the Original Agreement and expanded the territory to include the United States. Except for a few terms that are immaterial to this lawsuit, the terms of the Amended Agreement were typed in final form by December 16, including a date of "as of November 30, 2000." [2] The parties signed the Amended Agreement quite a bit later, on or about February 6, 2001; in my view, that does not affect the analysis. Under the Amended

---

[1] *See* December 23, 2000 letter by Plaintiff's Linda Nelson, part of Ex. 8 to Ritholz Reply Decl.

[2] *See* December 14, 2000 e-mail by Plaintiff's attorney Alan Spatz to Defendants' attorney Stuart Kleinman: "RBFC has been acting on the basis that the agreement has been approved on certain key issues (in particular, the extension of the January 20 date to March 20 and the right to exhibit in the U.S.). If this is not correct please advise immediately." (Novian Opp. Decl., Ex. C.) *See also* December 23, 2000 letter by Ms. Nelson: "Revised Contract ready for signature per Kleinman [on] December 16, 2000." *See also* Ritholz Reply Decl. ¶ 18: "The principal deal terms and language of the Amended Agreement were not worked out until mid-December 2000, . . . ."

Agreement, Plaintiff still received distribution rights for a two-year period; however, that period now ran from "the later of December 1, 2000 or three weeks after the Band approves the audio mix for the Film." (Amen. Agreement ¶ 8.)

The Band's sound expert, Tim Miller, prepared the audio mix on December 29 and 30, 2000 and January 9, 2001. The Band approved the audio mix by January 15, 2001. (Ritholz Reply Decl., Ex. 8, 1/15/01 e-mail by Plaintiff's Linda Nelson, which also says: "We are planning to release the film next weekend.") The film was released and exhibited in theaters in the United States and Canada starting in the week ending February 2, 2001. (Defs.' 56.1 Statement ¶ 11.) The Band attended a regional premiere of the film in Los Angeles in April 2001; that was the only public appearance made by any of the Band members in support of the film.

Plaintiff distributed the film throughout the world for more than a year. On April 22, 2002, Adam Ritholz (Secretary and General Counsel of Zeeks) learned that the WB television network was announcing that it would broadcast the film on April 25, 2002. He promptly contacted the owner of the WB network and learned that it had signed a contract with Plaintiff in which Plaintiff asserted that Plaintiff had received television rights from Defendants. On April 23, 2002, Mr. Ritholz sent a cease-and-desist letter to Plaintiff and stated that Plaintiff had violated the terms of the Amended Agreement. The Amended Agreement said (at ¶ 9(c)(iii)) that "[Plaintiff] may not exhibit, or grant any third-party the right to exhibit, the Film other than in large format theaters and in accordance with the terms and conditions contained herein." On April 24, 2002, the WB Network decided not to broadcast the film. [3]

Two days later, Plaintiff filed this lawsuit in our Court. Among other things, Plaintiff alleged that Defendants had breached the Amended Agreement some 17 months earlier, by unreasonably delaying approval of the sound mix.

Plaintiff filed an Amended Complaint on June 24, 2002. The Amended Complaint asserted five causes of action: (1) breach of contract; (2) breach of fiduciary duty; (3) negligence; (4) tortious interference with prospective business advantage; and

---

[3]     *See* Defs.' 56.1 Statement ¶¶ 19-24; Ritholz Opp. Decl.

(5) fraud.  Defendants filed answers attaching copies of the
Original Agreement and the Amended Agreement.  On September 19,
2002, Defendants moved for judgment on the pleadings pursuant to
Fed. R. Civ. P. 12(c).

On March 15, 2004, Judge Kimba M. Wood granted Defendants'
motion in part and denied it in part.  She dismissed two claims
with prejudice -- the claims for negligence and breach of
fiduciary duty.  (3/15/04 Order at 11-12.)  She dismissed two
other claims without prejudice -- the claims for fraud and
tortious interference.  (*Id.* at 13-16.)  She dismissed portions
of the claim for breach of contract:

> Plaintiff's claims brought under the [Original]
> Agreement fail because the Amended Agreement is a
> substituted contract that supercedes the [Original]
> Agreement.  A substituted contract renders unactionable
> any breaches that pre-date the substitution; any
> breaches that post-date the substitution may be brought
> only under the substituted contract.

(*Id.* at 8.)  Judge Wood then turned to the claims for breach of
the Amended Agreement that "took effect on November 30, 2000."
(*Id.*)  She wrote:  "Plaintiff's allegation that [D]efendants
exercised their discretion unreasonably and in bad faith is
sufficient to state a claim of breach of contract.  Plaintiff's
allegations regarding [D]efendants' unreasonable behavior at the
promotional event are likewise sufficient."  (*Id.* at 10.)

On April 12, 2004, Plaintiff filed a Second Amended
Complaint, restating its claims for:  (1) breach of contract,
(2) tortious interference, and (3) fraud.  On April 26, 2004,
Defendants filed an answer; they also asserted counterclaims, as
they had in 2002, attacking Plaintiff's attempts to license the
film for television and DVD.  On November 16, 2004, during
discovery, the case was reassigned to me.  On December 27, 2004,
I set a firm trial date of May 9, 2005.

On February 28, 2005, Defendants served a memorandum of law
in support of summary judgment along with the declarations of
Adam Ritholz, Helene Freeman, and Melinda Bell.  The same day,
Plaintiff served a memorandum of law in support of summary
judgment on all of the counterclaims, along with the declarations
of Farhad Novian, Linda Nelson, and Eddy Aslanian.  On March 17,
2005, Defendants served their opposition to Plaintiff's motion,
as well as additional declarations from Mr. Ritholz and Ms.

Freeman.  On March 17, Plaintiff served its opposition to Defendants' motion, as well as additional declarations from Mr. Novian and Ms. Nelson.  On March 25, 2005, both sides served reply memoranda of law; Defendants also served a reply declaration from Mr. Ritholz.

On April 1, 2005, Plaintiff served a 15-page surreply letter, an additional declaration from Ms. Nelson, and 43 pages of exhibits.  Later that day, Defendants served a 5-page letter.  On April 4, 2005, Defendants served a 1-page letter and a 4-page exhibit.  Later that day, Plaintiff served a 2-page letter and 14 pages of exhibits.  On April 7, 2005, I heard oral argument.  Post-argument letters were submitted by Plaintiff on April 14, by Defendants on April 15 and April 20, by Plaintiff on April 22 (including a fourth declaration by Ms. Nelson), and by Defendants on April 25.

### The Legal Standards for Summary Judgment

"[T]he plain language of Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the evidence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  "[A] dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The judge "construes the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor."  *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).  However, "the non-moving party may not rely on conclusory allegations or unsubstantiated speculation."  *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).  At the summary judgment stage, the parties must submit evidence; "[t]he time has come . . . 'to put up or shut up.'"  *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000).

### **PLAINTIFF'S CLAIMS FOR BREACHES OF CONTRACT**

Plaintiff makes three allegations of breach:

1.  That Defendants breached Paragraph 7 of the Amended

Agreement by "having unreasonably delayed issuing approvals for virtually all aspects of the Film and its related advertising." (Pl.'s Opp. Mem. at vii.)

2.  That Defendants "fail[ed] to take normal and customary steps, as they do with respect to all other projects, to promote the Film so as to insure its success." (*Id.*)  This allegedly breached Paragraph 23(b) of the Amended Agreement, which said that the parties "shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties[.]"

3.  That "Defendants breached the implied covenant of good faith" and fair dealing. (*Id.*)

Defendants assert that Plaintiff would be unable to prove any breaches.  However, for purposes of summary judgment, Defendants emphasize that Plaintiff failed to give adequate notice of any breach.  Alternatively, to the extent that any document might be construed as an informal notice of breach, Defendants say that Plaintiff gave written acknowledgment that the problem was cured.

1.  <u>The Claim That Defendants</u>
    <u>Unreasonably Delayed Approvals</u>

Paragraph 7 of the Amended Agreement stated:

[The] Band shall have the reasonable right to approve . . . the following items:

\*           \*           \*

(c) Music/Music Quality –- Approval of the music, including song selection and the music quality of the filmed performances (including any and all required rerecording and/or mixing in connection therewith).  It is expressly agreed that in the event that the Band determines that any music selected for inclusion in the Film is not of sufficient quality, the Producers, at the Band's sole election will be required to furnish necessary funding which will be a preapproved line item in the budget for all rerecording, remixing and engineering of such music until the Band is satisfied of the musical quality of the filmed performance.

*          *          *

        (f) Advertising Materials -- Except as expressly
    permitted pursuant to Paragraph 10, approval as to all
    advertising materials including without limitation key
    art, still photographs, trailers, teasers, television
    and radio commercials, and all print advertising.

A very crucial approval was the approval of the sound mix.  The
2-year License Period began to run "from the later of December 1,
2000 or three weeks after the Band approves the audio mix for the
Film."  (Amen. Agreement ¶ 8.)

    The Second Amended Complaint alleges:

        32.  Moreover, and following the
    execution [sic] of the Amended Agreement
    [Plaintiff probably means "following the
    November 30, 2000 effective date of the
    Amended Agreement"], representatives of the
    Band including each of the individual Band
    Members, unnecessarily prevented the timely
    finalization of the sound mix to be
    completed, by (i) unreasonably refusing to
    use sound mixing equipment located at a
    reputable sound studio in Burbank,
    California; (ii) acting in a rude, abusive
    and unprofessional manner during an attempt
    to complete the Film at The Village (December
    9 and December 10, 2000) and, thereafter,
    unreasonably refusing to approve the sound
    mix completed there; (iii) requesting that
    Sound Delux (December 11, 2000) or Disney
    Studios in Florida be used to finalize the
    Film and, after Plaintiff's agent traveled to
    Florida for that purpose, unreasonably
    refusing to proceed because the studios
    designated by Defendants purportedly "don't
    have the right equipment;" and (iv) failure
    to appear for a previously scheduled sound
    mix at DAVE Audio on December 26 through
    December 29, 2000.

                    *          *          *

        40. . . . Defendants materially breached

                        -7-

the Amended Agreement by, among other things,
engaging in the conduct set forth above and
<u>failing to cure the same after due notice
thereof.</u>

(emphasis added). Both the Original Agreement and the Amended
Agreement (at ¶¶ 19-20) had identical provisions concerning
"Right to Cure" and "Notice." I shall now quote them, with my
emphasis:

> 19. <u>RIGHT TO CURE</u>: <u>No failure</u> by Producer or
> Band to perform any of Producer's or Band's
> respective obligations hereunder <u>shall be deemed a
> breach</u> hereof, <u>unless</u> Band or Producer gives the
> other <u>written notice</u> of such failure and such party
> fails to cure such nonperformance within forty-
> eight (48) hours after such party's receipt of such
> notice.

> 20. <u>NOTICE</u>: All notices hereunder shall be
> sent certified mail, return receipt requested, or
> delivered by hand or by commercial overnight
> courier with a signed receipt to the applicable
> address set forth below; unless and until written
> notice, via registered mail, to the contrary is
> received by the applicable party.

*          *          *

> If to Band: Zeeks, Inc.
> c/o Adam Ritholz, Esq.
> Leibowitz, Roberts & Ritholz LLP
> 183 Madison Avenue
> New York, NY 10016

> Copy of
> Notices to: c/o Stuart T. Kleinman
> Frankfurt, Garbus, Klein &
> Selz, P.C.
> 488 Madison Avenue
> New York, NY 10022

At times, Plaintiff seems to argue that it could wait until April
26, 2002 and then give notice of an alleged breach that occurred

more than a year earlier. [4]  I reject this as an irrational reading of Paragraph 19.

In addition to Paragraphs 19 and 20, the parties were subject to New York's common-law doctrine of election of remedies: [5]

> The New York doctrine of election of remedies provides that upon learning of a breach, a party must choose between terminating the contract and continuing performance.  If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its rights to sue the breaching party.

*Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 620 (S.D.N.Y 2004) (citations omitted).  It is undisputed that Plaintiff continued performance under the Amended Agreement after December 2000 (and for more than a year after that); therefore, Plaintiff was obligated to give notice of any alleged breaches in order to maintain its right to sue.

Plaintiff does not contend that it followed the procedures spelled out by Paragraphs 19 and 20 of the Amended Agreement. Instead, Plaintiff argues that "notice of [Defendants' alleged] breaches was actually given to, and received by, Defendants.  On multiple occasions, Plaintiff provided Defendants with e-mail, written <u>and oral</u> notice of their failure to perform and requested that Defendants cure the non-performance."  (Pl.'s Opp. Mem. at 1, emphasis added.)  Plaintiff claims that the notices were provided by Linda Nelson, who was Plaintiff's Manager and Chief Financial Officer in 2000 and 2001.  During that period, she sent and received numerous e-mails to and from Defendants' agents.  She also had many oral conversations; she has submitted her recollection of them, but it is extremely vague and general.  (Nelson Opp. Decl. ¶¶ 7, 18, 21.)  Moreover,

---

[4]     *See* Pl.'s Opp. Mem. at 9-10, which is doubly confusing because it asserts that "the two-year license period terminated in March 2002."  In fact, as of March 2002, the License Period was not due to terminate for another year.

[5]     The Original Agreement and the Amended Agreement (at ¶ 21) each said that it "shall be governed by the laws of the State of New York[.]"

any alleged "oral" notice was clearly inadequate; pursuant to Paragraph 19 of the Amended Agreement, notice of any alleged breach had to be "written notice."

Plaintiff also argues that Defendants waived the contractual requirement of written notice addressed to Mr. Ritholz. Plaintiff makes this argument even though both the Original Agreement and the Amended Agreement (at ¶¶ 23(c), 23(f), and 23(j)) contained the following provisions:

(c) <u>Modifications or Amendments</u>
No amendment, change or modification of this Agreement shall be valid unless in writing and signed by all the parties.

(f) <u>Entire Agreement</u>
This Agreement (along with Exhibit A and Schedule A attached hereto) constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter, are hereby terminated and canceled in their entirety and are of no further force or effect.

(j) <u>Non-Waiver</u>
No waiver by any party hereto of a breach of any provision of this Agreement shall constitute a waiver of any preceding or succeeding breach of the same or any other provision hereof.

Plaintiff quotes from an opinion by Judge Ward in *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989); his judgment was affirmed at 41 F.3d 1570 (2d Cir. 1994), but the Second Circuit was not asked to opine on this portion of Judge Ward's opinion:

. . . While the Contract contains a no-waiver provision in paragraph G.2, New York law allows the parties to waive such a no-waiver provision by a subsequent course of conduct. *See Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 39-40 (2d Cir. 1986); *Seven-Up Bottling Co. (Bangkok), Ltd. v. Pepsico, Inc.*, 686 F. Supp. 1015, 1022-23 (S.D.N.Y. 1988). TWA's approval of the sale with knowledge of

certain specific changes in personnel constituted a
waiver of its right to invoke the key management team
clause <u>as applied</u> to those <u>same</u> employees.

722 F. Supp. at 1098 (emphasis added). I do not know the
wording of "paragraph G.2" in the *Travellers* contract. But I do
know that *Christian Dior* and *Seven-Up* did not involve contract
provisions like Paragraphs 19 and 20 in the case at bar.
Moreover, Judge Ward found a waiver because TWA's conduct
constituted an intentional relinquishment of its right to invoke
<u>the very clause</u> that dealt with those "specific changes in
personnel" -- namely the "key management team" clause.

    In the case at bar, Plaintiff's waiver argument is much
more convoluted. Plaintiff points to a side agreement that
became Exhibit A to the Amended Agreement. The side agreement
said (with my emphasis):

        . . . [Zeeks, Inc.] hereby designates the
    following individuals to exercise Zeeks' approval
    rights under the Agreement. Such approval will be
    exercised as follows: <u>RBFC One shall submit a notice</u>
    (the "Notice") <u>requesting approval</u> from Zeeks as
    provided in the Agreement. Copies of all Notices will
    be sent as provided in the Agreement. The individual
    designated below (the "Designated Person") will sign
    such Notice indicating the approval of Zeeks and such
    signed Notice will be valid and binding on the
    undersigned [Zeeks, Inc. and the Band] . . . .

    Despite that side agreement, Plaintiff requested various
approvals orally or by e-mail and not in a form that explicitly
called for a signature by Defendants' designee. Nevertheless,
Defendants did not object. During the period from November 2000
to February 2001, Defendants frequently answered such requests
with oral approvals. Plaintiff proceeded to act on such oral
approvals, and apparently this course of conduct did not result
in any severe misunderstandings.

    Plaintiff now argues that this course of conduct could lead
a rational jury to conclude that Defendants waived a <u>different</u>
clause -- namely, Paragraphs 19 and 20 in the 15-page Amended
Agreement, which required Plaintiff, if claiming any <u>breach of
contract</u>, to send a "written notice" to Zeeks's General Counsel.
As a matter of theory, Plaintiff cites no authority that
endorses such a sweeping waiver. As a matter of evidence, no

-11-

rational jury could find that this course of conduct amounted to an intentional relinquishment of the requirement that Plaintiff give Mr. Ritholz "written notice" of breach. That requirement was also in the Original Agreement dated as of June 14, 2000. Plaintiff is hard-pressed to show any written notice of breach during the crucial period from November 30, 2000 to December 20, 2000. It argues that Defendants waived such written notice. When did this alleged waiver occur? Plaintiff does not say; as usual it prefers to talk in vague generalities. But the course of conduct was certainly not well-established by December 20, 2000.

The history of the side agreement is delineated in a series of e-mails submitted to me by Plaintiff on April 14, 2005. On November 3, 2000, Plaintiff's attorney Spatz wrote to Defendants' attorney Kleinman:

> . . . [I]t is better for all if we formalize the approval process by obtaining written approvals. If Zeeks will delegate to others the authority to approve on its behalf some or all matters, we should either build this into the Agreement or Zeeks should give us a letter to that effect.

Five minutes later, Mr. Kleinman replied:

> I don't disagree. I will talk to the team. . . . Obviously, this does not apply to financial/legal matters.

On November 20, Mr. Kleinman e-mailed "the suggested 'approval' letter." A few hours later, Mr. Spatz e-mailed minor comments. In response, on December 12, Mr. Kleinman e-mailed what sounds like the final version. Five weeks later, the document was given a date of January 18, 2001; one additional week later, however, it was sent out for signatures bearing the date of December 12, 2000.

Plaintiff has not submitted specific details about any course of oral approvals between November 20 and December 20, 2000 or between December 12 and December 20. Moreover, the procedure for written approvals was the brainchild of Plaintiff's attorney, for Plaintiff's benefit. Nevertheless, Plaintiff apparently failed to submit written requests for signed approvals. Defendants did not object, but that is no evidence that they intentionally relinquished their contractual

rights to written notice if Plaintiff wanted to claim a breach of contract.

Accordingly, Plaintiff must show that it gave Mr. Ritholz a "written notice" concerning any alleged breach. In opposing summary judgment, Plaintiff has submitted a number of writings (generally e-mails) that Ms. Nelson sent to agents of Defendants (generally Melinda Bell and Johnny Wright of the Band's management company). I have reviewed those documents. None of them uses the word "breach." None of them says that Defendants are acting "unreasonably." None of those documents complied with Paragraph 20, in that (a) many of them were not addressed to Mr. Ritholz, and (b) very many of them were not copied to Mr. Kleinman, and (c) none was sent return receipt requested. Even if a jury were permitted to forgive these defects, no rational jury could find that those documents constituted notice of breach, with one possible exception.

On December 20, 2000, Ms. Nelson hand-delivered a letter to Johnny Wright. As the reader will see, Ms. Nelson ends by listing three approvals that she needs urgently. The most important one is the approval of the sound mix. One month earlier, on November 16, 2000, Ms. Nelson wrote that "we all feel that the sound needs to be edited by Tim [Miller]." (Ritholz Reply Decl., Ex. 15.) On behalf of Plaintiff, Ms. Nelson eventually signed the 2-page side agreement dated December 12, 2000, which designated specific "individuals to exercise Zeeks' approval rights." As to the "music quality" (sound mix), the designated person was Tim Miller. In her December 20, 2000 letter, Ms. Nelson laments the delays in getting Mr. Miller into a studio where he could prepare a sound mix. She says that she has now found a suitable sound studio in Toronto and that it is crucial that Mr. Miller go there during the period of December 26-29. A rational jury could not find that this letter was saying that Mr. Miller had been unreasonable, or that he would be unreasonable if he did not create the sound mix before December 29.

On the other hand, a rational jury could find that the December 20 letter essentially accused Johnny Wright of acting unreasonably, to wit, by rebuffing Ms. Nelson's attempts to meet with him on December 14, 15, 16, 17, 18, 19, and 20. She wanted to show him a video version of the 45-minute film, without sound, and she wanted him to approve the visual portion of the film. She also wanted to show him marketing materials (trailers and radio and TV spots) for his approval.

-13-

I shall now set forth most of the text of the letter that Ms. Nelson hand-delivered to Mr. Wright on December 20, 2000:

Dear Johnny,

I have been in Orlando for eight days.  I have repeatedly tried to set up a meeting with you . . . every day for the past six days . . . .  Up to now, I have been very patient, as I understand you are extremely busy, but we have had the film finished, except for the sound track for almost three months and we have been unable to complete the sound mix . . . or get approvals on the TV commercials, trailer and radio spots.  Several theaters were counting on releasing this film in time for the Christmas holidays and are extremely upset by the delays.  It is difficult to do business with people who do not take business seriously enough to schedule and keep appointments or take phone calls.

*          *          *

1.  SOUNDTRACK – . . . We have tried on four occasions to set up studio time in a way that Tim [Miller] is comfortable with.  So far we have been unsuccessful.  Again, this is not his fault.  He is not a film soundtrack guy.  Tim was sure that Disney had the capability to do the job, only to find that they had nowhere near the capability either equipment-wise or people-wise. [6] . . . I only know of one permanent studio that can handle this job, and that is a studio in Toronto.  I have wasted about $60,000 trying to get this sound mix done, [b]locking out studios, travel,

---

[6]     The Second Amended Complaint (at ¶ 32, quoted earlier) essentially states that (a) the Disney Studio in Florida (and the earlier suggested studios) actually had the capability, and (b) Tim Miller rejected them unreasonably.  But Ms. Nelson's 12/20/00 letter did not make either statement.  Indeed, two paragraphs earlier, her letter said: "[Disney] had an overrun on a job that was booked previously and weren't equipped to do the job anyway, . . . ." (emphasis added).  When a contract requires a "written notice" of any "failure . . . to perform," then that written notice must describe each failure with reasonable clarity.

etc. already and I need to get this film back on track.

    2.  FILM PRINTING - The film has been done since September.  We wanted you to see the film on the giant screen with the sound.  [However,] [s]ince we are so far behind schedule, one of the main reasons I wanted to meet with you this week was to show you a video version of the film, without the sound mix, so that we could order prints for the theaters.  I would still like to do this.  If I can meet with you tonight or tomorrow, I can still order the prints and get some into the theaters by January 1.  I just need one hour of your time.

         *            *          *

    We will now miss delivering the film to the fans during the Christmas holidays.  We have eighty leases in negotiation that were planning to start the film on January 1, 200[1], providing they had time before Christmas for press screenings and promotions.  This schedule is now completely blown and I am not sure how to resolve it.  Tim has informed me that he can be available for four days, starting December 26th.  I am in the process of trying to book a studio now.  I still need the video version of the film approved so I can go to print.  I'm sure you understand my dilemma.  I will [still] be [in Orlando] until 3:00 p.m. tomorrow afternoon (Thursday).  If we can get together before then, either this afternoon, this evening or tomorrow during the day, please call me on my cell phone.

This December 20, 2000 letter to Mr. Wright is significant because it was hand-delivered.  It is also significant because, at the end of the letter, Ms. Nelson typed: "cc:  Alan Spatz, Adam Ritholz, Jonathan Sanger."  Mr. Ritholz should have been the direct addressee for any notice of breach.  On March 17, 2005, Plaintiff served a declaration of Ms. Nelson (misdated as February 17) which attached a copy of the crucial letter and described it as follows:

    A December 20, 2000 letter from me to Johnny Wright and Adam Ritholz, which I delivered by hand to Mr. Wright and <u>emailed to Mr. Ritholz</u> on December 20, 2000; . . .

(Nelson Opp. Decl. ¶ 5(i), emphasis added).  The e-mailing to Mr.

Ritholz was denied by him in his Reply Declaration dated March 25, 2005; at Paragraph 23, he stated:

> . . . I archive my e-mails, and in connection with the document production in this matter, [I] printed out my entire archive of e-mails from "Linda Nelson." All of the e-mails print out with consecutive pagination at the bottom of each page of the entire archive, in reverse chronological order. The archive reflects that I did not receive an e-mail of the December 20, 2000 letter to Johnny Wright from Linda Nelson. Annexed hereto as Exhibit 6 are all the e-mails I received from Ms. Nelson between December 14, 2000 and December 24, 2000 [paginated from 84 to 88, and Bates-stamped from AR 0447 to AR 0451]. [7]

Undeterred, Ms. Nelson signed another declaration saying that: "I sent the December 7, 2000 email to defendants . . . ." (3/31/05 Nelson Decl. ¶ 8.)

On the morning of April 21, 2005, I faxed a Memorandum and Order to the attorneys. I quoted Mr. Ritholz's evidence and then I wrote:

> Plaintiff has not contradicted that evidence. Nor has anyone produced a copy of the December 20 letter in an e-mail format.

> I believe that the pertinent New York authority is *Azriliant v. Eagle Chase Associates*, 213 A.D.2d 573, 624 N.Y.S.2d 238 (2d Dept. 1995), where the Appellate Division reversed and granted summary judgment to defendants and wrote:

>> . . . Here, the parties adopted a provision requiring notice by certified mail.

---

[7]     Defendants do not dispute that Mr. Wright received the December 20 letter, but they deny that a copy was sent to Mr. Ritholz in any format prior to the filing of this lawsuit. Mr. Ritholz does acknowledge that on December 24, 2000, while he was on vacation, his computer received an e-mail copy of another letter from Ms. Nelson to Mr. Wright, dated December 23, 2000. (Ritholz Reply Decl. ¶ 25.) But the December 23 letter did not come close to serving as a notice of breach.

. . . [T]he defendants' denial of the receipt of
this letter is uncontradicted.  While a rebuttable
presumption of receipt based on proof of regular
mailing may be available in cases where regular
mailing is itself sufficient to comply with the
requirements of the parties' contract, we do not
believe that this presumption is available to the
plaintiff herein, in the absence of sufficient
evidence attesting to the mailing of the June 5,
1988 letter itself, or to the "existence of an
office practice geared to ensure the proper
addressing or mailing of [correspondence]."

*Azriliant*, 213 A.D.2d at 575, 624 N.Y.S.2d at 240,
citations omitted.  I am confident that New York law
would set the bar even higher when the document was
allegedly mailed electronically.

On the other hand, the Second Department has also
written:  "Strict compliance with the contract notice
provision was not required because the plaintiff does
not claim that she did not receive actual notice, or
was prejudiced by the deviation." *Suarez v. Ingalls*,
282 A.D.2d 599, 723 N.Y.S.2d 380 (2d Dept. 2001).  In
the case at bar, a rational jury could find that Mr.
Ritholz received actual notice, by December 22, 2000,
that (a) Ms. Nelson wanted Tim Miller to mix the sound
starting on December 27, and (b) Ms. Nelson wanted
Johnny Wright to permit Plaintiff to exhibit the film
for about one week with the soundtrack that had been
prepared by Iwerks rather than by Tim Miller.
However, on the present record, a rational jury could
not find that Mr. Ritholz received actual notice of
Ms. Nelson's December 20 complaint about delays in
approvals of the trailers and the radio and TV spots.
I will give Plaintiff until April 22, 2005, at 5:00
p.m. New York time, to supplement the record on this
point.

On April 22, 2005, Ms. Nelson responds with a new
declaration.  She tacitly concedes that she did not e-mail the
crucial letter.  She does not mention that she is contradicting
her earlier declarations.  She now asserts as follows:

6.  I wrote the letter on December 20, 2000 marked
002297, on my laptop and printed out several copies in the

business center at the hotel. . . . I remember printing the
envelopes for Johnny Wright, Alan Spatz, Adam Ritholz and
Jonathan Sanger, putting the letters in the envelopes and
mailing them on December 20, 2000 from the hotel.  I also
also [sic] took a taxi to hand-delivered [sic] a copy to
Johnny Wright's office, before leaving to go back to Los
Angeles.

(4/22/05 Nelson Decl. ¶ 6.)  This belated turn-about is barred by
the "sham affidavit" doctrine.  *See Trans-Orient Marine Corp. v.
Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991)
("The rule is well-settled in this circuit that a party may not,
in order to defeat summary judgment, create a material issue of
fact by submitting an affidavit disputing his own prior
testimony.").  In *Silberstein v. Fox Entertainment Group*, 2004 WL
1620895, at *6 n.5 (S.D.N.Y. July 19, 2004), Judge Holwell
granted summary judgment, cited *Trans-Orient*, and held that
plaintiff could not create an issue of fact by submitting a
"declaration [that] diverges from her earlier account . . .
contained in two affidavits previously submitted in this
litigation."

On the crucial December 20, 2000 letter, Ms. Nelson typed
that she was intending to send "cc"'s to Mr. Ritholz (who was
counsel to Zeeks) and to Mr. Spatz (who was counsel to
Plaintiff).  During the discovery process, Mr. Ritholz and Mr.
Spatz each produced his correspondence file and neither contained
a copy of Ms. Nelson's December 20 letter in any format
whatsoever.  (Ritholz Reply Decl. ¶ 23; Freeman 4/25/05 letter to
me at 1.)  Hence it is clear that Ms. Nelson simply forgot to
send the "cc"'s, and that her contradictory recollections (e-mail
vs. regular mail) are equally unreliable.  In short, Plaintiff
has failed to meet the *Azriliant* standard and failed to show a
triable issue that Mr. Ritholz received a copy of the December 20
letter.

The Ritholz Reply Declaration (at ¶ 24) concedes that some
of the subject matter of the December 20 letter was conveyed to
him by Ms. Nelson in a telephone conversation, which prompted him
to: (a) leave a voicemail for Mr. Wright and Ms. Bell, and then
(b) e-mail them as follows on Friday, December 22, 2000: [8]

---

[8]   This e-mail by Mr. Ritholz was faxed to me on March 24,
2005 by Mr. Novian, who had inadvertently failed to enclose it
with his March 17 opposing exhibits.

Wanted you to see this. [9]  I know Linda Nelson is a big pain, but we're in this now so we better do whatever we need to, to make the best of it.  Linda tells me that she has been through 4 different studios with Tim to get the sound done and for one reason or another it has never been right for Tim.  She tells me this is the 5th time she is trying to set this up.  So please, let's do what we can to make sure that if we want Tim involved in this, that he gets on the plane for Toronto.  Linda took pains to point out that she did not have to have Tim mix the film sound, only approve it.  So she feels she is bending over backward.  We have to bear in mind that we do have to be reasonable about this. . . .

In that e-mail, Mr. Ritholz demonstrates that he has had some sort of communication with Ms. Nelson where she protested delays in approval of the sound mix.  The final line of the e-mail suggests that Mr. Ritholz understood that the sound-mix issue implicated the reasonable approval provision of the Amended Agreement.

Notice provisions in a commercial contract should not be construed pedantically.  *See Contemporary Missions, Inc. v. Famous Music, Inc.,* 557 F.2d 918, 925 (2d Cir. 1977):  "We decline to construe the notice provision as if it were a common

---

[9]     Plaintiff speculates that the word "this" referred to a copy of the December 20, 2000 letter from Ms. Nelson to Mr. Wright.  If that were true, Mr. Ritholz would not have laboriously paraphrased Ms. Nelson's primary complaint.  (She and Mr. Ritholz agree that she made a telephoned complaint to him prior to his December 22 e-mail to Mr. Wright and Ms. Bell; *see* 4/22/05 Nelson Decl. ¶ 7.)  Mr. Ritholz's first sentence has an internal logic:  I wanted you to see my message in this visual form in addition to hearing my message in the audio form I just left in my voicemail to you.  (Later in this e-mail, Mr. Ritholz alludes to this voicemail: "As I mentioned in my voicemail to you, she [Ms. Nelson] has a big problem in 3 markets where exhibitors have already committed huge dollars to advertising.")

law pleading requirement under which every slip would be fatal."[10]

On the other hand, it is important to analyze exactly how Ms. Nelson described the alleged breaches in her letter of December 20, 2000.  I will soon make this analysis and, as we shall see, her descriptions at that time were far different from the allegations made by Plaintiff beginning in April 2002.  Prior to making that analysis, however, I will discuss (and reject) a threshold argument made by Defendants.

Defendants argue that, under the doctrine of election of remedies, Plaintiff's "failure to give notice that it intended to preserve a claim for damages while simultaneously signing the Amended Agreement in February 2001 and availing itself of the benefits of that Agreement for the next sixteen months forecloses [Plaintiff's] claim of breach as a matter of law."  (Defs.' Reply Mem. at 5; *see also* Defs.' Mem. at 11.)  However, the Amended

---

[10]     Defendants cited other cases for the proposition that a claim for breach of contract is barred if the plaintiff failed to comply with a contractual provision requiring notice of breach. (Defs.' Mem. at 7-8.)  In each of those cases, however, the plaintiff either gave no notice at all or gave notice less sufficient than Plaintiff's notice here.  *See Bausch & Lomb* Corp. *v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (party "committed a material breach by terminating the Agreement upon two days notice . . . in contravention of [the Agreement's] 30 day notice period"); *Filmline Cross Country Prods. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) ("purported notice of termination made no effort to comply with the explicit [notice] requirement"); *Needham v. Candie's Inc.*, 2002 WL 1896892, at *3 (S.D.N.Y. Aug. 16, 2002) ("It is undisputed that Plaintiff failed to provide any notice of" the alleged breach); *Point Prods. A.G. v. Sony Music Entertainment, Inc.*, 2000 WL 1006236, at *4 (S.D.N.Y. July 20, 2000) ("Sony did not provide Point with notice and opportunity to cure the alleged default"); *Sauer v. Xerox Corp.*, 17 F. Supp. 2d 193, 196 (W.D.N.Y. 1998) ("It is undisputed that Sauer's only written notice to Xerox concerning Xerox' alleged failure to pay renewal rent came by letter . . . one day after this suit was filed"); *Karabu Corp. v. Pension Benefit Guaranty Corp.*, 1997 WL 759462, at *8 n.8 (S.D.N.Y. Dec. 10, 1997) (plaintiff gave no notice of alleged breach); *SVS, Inc. v. Rabbit Ears Prods., Inc.*, 1992 WL 91183, at *11 (S.D.N.Y Dec. 12, 1991) (plaintiff's notice of default failed to include "decisive" issue).

Agreement's first line states: "THIS AMENDED AND RESTATED AGREEMENT (this 'Agreement') is made as of November 30, 2000." Indeed, Judge Wood wrote that "the Amended Agreement took effect on November 30, 2000." (3/15/04 Order at 8.) A rational jury could find that the Amended Agreement was already operative when Linda Nelson delivered her December 20, 2000 letter to Mr. Wright. Furthermore, a rational jury could find that the letter to Mr. Wright sufficed as notice of breach, thus preserving Plaintiff's right to sue for any failure to perform that (a) was described in the letter, (b) was promptly brought to Mr. Ritholz's actual notice, (c) was a breach of contract, and (d) was not timely cured.

To the extent that Defendants timely cured a problem described in a notice of breach, Plaintiff cannot sue for breach of contract. *See Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902, 906-07 (2d Cir. 1985) (holding that Southwire could not terminate a contract "[b]ecause Trans World had cured any potential default by completing all requested deliveries before the period for cure expired"); *SVS, Inc. v. Rabbit Ears Prods., Inc.,* 1992 WL 91183, at *10 (S.D.N.Y. Dec. 12, 1991) (holding that a "nondefaulting party cannot terminate a contract with a party that cures all defects within the cure period").

In her December 20, 2000 letter, Ms. Nelson identified three sets of items that she wanted Defendants to approve as soon as possible: (1) the sound mix and the sound track; (2) the visual print; and (3) the trailers and the radio and TV spots. I analyze each of these items in turn.

### a. The Sound Mix and the Sound Track

On November 16, 2000, Nelson sent an e-mail to Mr. Ritholz that said (with my emphasis):

> . . . Of course, we will not ship any prints, until Tim Miller and NSYNC are entirely happy with the film.
>
> Last night, Tim and I saw the film with sound for the first time. We were happy with the image, <u>but we all feel that the sound needs to be edited by Tim</u>, so that it will not only have the "look" of NSYNC, but also the "sound" of the live production. . . . This is what we all want and I am sure everyone will be willing to wait a little extra time to get a great result. . .

As of December 12, 2000, the side agreement formally designated Tim Miller "to exercise Zeeks' approval as to the "[M]usic quality of the film performances."

In her December 20, 2000 letter, Ms. Nelson stated that she had tried to set up studio time for Mr. Miller to complete the film's sound mix on at least four previous occasions. She did not accuse Mr. Miller of being unreasonable. In fact, she wrote: "Again, this is not his fault." Even if we were to assume that she meant to convey that Mr. Miller had unreasonably delayed approval of the sound mix, it is clear that she specified the cure: her letter went on to say that she was in the process of booking a Toronto sound studio for December 26-29. In an e-mail to Mr. Miller dated December 23 at 12:09 A.M.,[11] she told Mr. Miller: "I will arrange . . . for you to travel Tuesday night [December 26] to Toronto," meaning that she wanted him to start mixing the sound on December 27.

Plaintiff asserts: "If a rational jury could find that Linda Nelson's 12/20/00 e-mail was a notice of breach, then they would have to conclude that the Defendants had a contractual right to cure that breach within 48 hours, which right they failed to timely exercise." (Pl.'s 4/1/05 Surreply at 12.) I reject this argument. Both contracts stated: "No failure . . . to perform . . . shall be deemed a breach unless . . . such party fails to cure such nonperformance within forty-eight (48) hours afer such party's receipt of such [written] notice." However, if the notice of breach states a longer period for cure, then its writer cannot insist that the cure be completed earlier. In her December 20 letter, Ms. Nelson proposed an arrangement to have Mr. Miller complete the sound mix by December 29.

Beginning on December 29, 2000, the undisputed evidence shows that Defendants handled the sound mix to Ms. Nelson's satisfaction. On December 29, Ms. Nelson circulated an e-mail stating that she and Mr. Miller were in Toronto and "to start work." (Ritholz Reply Decl., Ex. 8.) On December 30, 2000, Ms. Nelson sent an e-mail reporting that Mr. Miller "worked a twelve-hour day and we start again in a little while . . . I know that you will all be overjoyed with Tim's work." (*Id.*) On January 3, 2001, Ms. Nelson sent an e-mail to Mr. Wright and Ms. Bell (with

---

[11]     This e-mail to Mr. Miller was faxed to me by Mr. Novian on March 24, 2005.

a copy to Mr. Ritholz, among others).  Ms. Nelson wrote:

> . . . It was amazing to watch Tim work with
> the right equipment and a good team.  We do have
> at least one more day to mix though, as Tim wanted
> to do a good job on the trailer and it's
> fantastic. . . . I don't think Tim can go back to
> Toronto until the eighth or ninth.  The[n] we will
> be ready for you [Mr. Wright and Ms. Bell] and
> NSYNC.  Tim feels it is essential for NSYNC to
> come to Toronto to the studio, just in case they
> want to twe[a]k a little bit.  <u>I would advise this
> too</u>.

(*Id.*, emphasis added.)  To recapitulate:  Ms. Nelson wrote that
it was necessary to mix the sound for "at least one more day," on
January 8 or 9, and only after that would Plaintiff "be ready" to
show the film with sound to Defendants for final approval.
Moreover, Ms. Nelson concurred that "it is essential" that the
Band members travel to Toronto just in case they want to
"twe[a]k" the sound mix before giving final approval.

Indeed, on or about January 10, 2001, Band member Joshua
("JC") Chasez came to Toronto and worked with Mr. Miller to make
a change on the sound track.  Ms. Nelson confirmed that the delay
in early January had been entirely appropriate.  On January 15,
2001, she wrote:

> We are planning to release the film next weekend,
> as JC [Chasez] and Tim finished with the sound track
> before leaving Toronto. . . .
>
> . . . I must say that Tim did an amazing job and
> worked long hours to get the job done and the studio
> staff are looking forward to working with him again.
> It's a shame we didn't find that studio a few months
> ago, but now we know.  I plan to do all my giant screen
> film soundtracks there in the future.

(*Id.*)

In sum, there was a delay from December 29 to January 15 as
to the sound mix, but Ms. Nelson's e-mails did not suggest that
this delay was unreasonable or unacceptable.  *See* her e-mails on
January 15, 16, and 17, 2001.  (*Id.*)  These e-mails show that
there was no longer any delay caused by lack of approvals.  On

January 16, she writes: "WEG [Wright Entertainment Group] has
sent us approvals for all materials, including TV and Radio
commercials." She also asks for "formal notice of approval from
Adam Ritholz" -- but there is no urgency: "I would appreciate
receiving this notice of approval for my files." On January 15
and 17, she mentions the sound track. She clearly conveys that
the sound track has been approved -- apparently orally. She
expresses no urgency about getting the approval in writing. (She
does express some urgency about getting faxes of each Band
member's signature on the Amended Agreement.) On Monday, January
15, she writes: "We are planning to release the film next
weekend." I read this to mean Friday, January 26. In fact, the
release occurred on or before Friday, February 2. This was a
delay of, at most, seven days. But there is no evidence that
this further delay was caused by lack of approval of the sound
mix or the sound track. [12]

     b.   <u>The Visual Print</u>

     In her December 20, 2000 letter, Ms. Nelson asked Mr. Wright
to approve the film print "without the sound mix, so that we can
order prints of the film." However, nothing in the Amended
Agreement said that Defendants had an obligation to approve the
visual print divorced from the sound portion. Ms. Nelson
acknowledged this in a December 31, 2000 e-mail; the context was
as follows. A theater in Kansas City wanted to screen the film
as part of a January 1st celebration. The sound mix, of course,
was not ready. Ms. Nelson wrote to Mr. Wright and Ms. Bell:

> I asked Adam [Ritholz] if he would approach you
> about a one time screening using the unapproved sound
> track, if they would sign a letter agreeing to a one-
> time usage. . . . <u>I know this is a huge request and
> I fully understand if you cannot allow this</u>.

(Ritholz Reply Decl., Ex. 8, emphasis added.) That e-mail makes

---

[12] There is some evidence that the delay was caused by
wrangling over the terms of the escrow. Paragraph 12(a) of the
Amended Agreement said "the escrow obligations will be governed
by an agreement mutually acceptable to Producer and the Band."
In Exhibit A (the side agreement), Zeeks designated Barry
Klarburg, C.P.A. to approve the form of escrow agreement. The
record shows no written notice by Plaintiff saying that
Defendants' position on the escrow was unreasonable.

clear that Plaintiff realized that Defendants were not obligated to approve the visual print until they also had the sound track (as edited by Mr. Miller).  As discussed above, Defendants approved the sound track in a timeframe that Plaintiff accepted. Therefore, it was not unreasonable for Defendants to delay their approval of the visual print until their approval of the sound track.

Moreover, two documents suggest that Mr. Wright did approve the visual print by December 28, 2000.  (Freeman Opp. Decl. ¶¶ 3-5 and Exs. A and B.)  During oral argument, Mr. Novian said that the approval of the visual print was later delayed by an unreasonable demand for credits beyond those described in Paragraph 14 of the Amended Agreement.  I replied that the record shows no written notice by Plaintiff stating that the demand for extra credits was unreasonable.  (4/7/05 Tr. 70-72.)  Moreover, Ms. Nelson's wrote in an e-mail on January 15, 2001:  "[W]e are adjusting Tim's credits on the back of the film to reflect the fact that he and Cory did the soundtrack[.]" (Ritholz Reply Decl., Ex. 8.)

c.   <u>Trailers and Radio and TV Spots</u>

_____On November 11, 2000, Ms. Nelson sent a trailer and certain radio and TV spots to Mr. Wright and Ms. Bell for approval. **13** They misplaced these materials during an office move.  These materials contained music excerpts.  Both the Original Agreement and the Amended Agreement (at ¶ 13) said: "Producer [Plaintiff] is responsible to obtain all music licenses."  By December 12, 2000, the side agreement designated Ms. Bell to give approvals for "advertising and film marketing material" and designated Mr. Ritholz to give approvals for "music licenses."

On December 12, 2000, Ms. Nelson traveled to Orlando.  On December 14, 2000, she came to Mr. Wright's new office with a replacement set of the trailers and radio and TV spots.  She tried to show them to him for six straight days, without avail. (It is unclear to me whether his colleague Ms. Bell was available).  On December 20, Ms. Nelson hand-delivered her caustic letter to Mr. Wright, and said she would stay in Orlando for one more day.  I earlier quoted large portions of that letter; I now quote the following portion:

---

[13]     _See_ timeline set forth in Ms. Nelson's December 23, 2000 letter to Mr. Wright.

4.  TRAILERS, RADIO AND TV SPOTS –- Theaters still
do not have marketing materials.  They got misplaced
during your office move and I have been unable to show
you anything since I've been here.

We will now miss delivering this film to the fans
during the Christmas holidays.  We have eighty leases
in negotiations that were planning to start the film on
January 1, 200[1], providing they had time before
Christmas for press screenings and promotion.  This
schedule is now completely blown and I am not sure how
to resolve it. . . . I will be [in Orlando] until 3:00
tomorrow afternoon (Thursday).  If we can get together
before then, either this afternoon, this evening or
tomorrow during the day, please call me on my cell
phone.

Applying the "sham affidavit" doctrine, there is no evidence
that Mr. Ritholz received actual notice of <u>this portion</u> of the
December 20 letter.  If he had, he could have urged Mr. Wright
and/or Ms. Bell to review the trailers and the radio and TV
spots.  In any event, Mr. Wright and/or Ms. Bell gave their
approval of the "creative" aspects of the TV and radio spots by
December 28, 2000; on that date, Ms. Nelson wrote: "We have
approval on the TV and Radio spots."  Moreover, Plaintiff could
not release the radio and TV spots to the exhibitors until
Plaintiff had "obtain[ed] all music licenses" for radio and TV
use, and received Mr. Ritholz's reasonable approval as to the
legal sufficiency of those music licenses.  The evidence shows
that as late as February 16, 2001, Plaintiff had failed to obtain
music licenses for radio and TV use. [14]  As to the trailer, its
sound track was not finished until December 30; Ms. Nelson wrote
in an e-mail on January 3, 2001: "Tim wanted to do a good job on
the trailer and it's fantastic."

To summarize:  Applying the "sham affidavit" doctrine,
there is no evidence that Defendants gave written notice to
Mr. Ritholz that Plaintiff was claiming a breach with
respect to the trailers or the radio spots or the TV spots.
If I were to permit Ms. Nelson's belated declaration about a
mailing, then her December 20 letter might have reached Mr.
Ritholz by Friday, December 22.  Mr. Wright's delays were

---

[14]     *See* Ms. Freeman's April 20, 2005 letter to me at 4-5,
which gives detailed citations to the documentary evidence.

cured on December 28.  Technically, that was longer than 48 hours after Mr. Ritholz's hypothetical receipt, but the delay was inconsequential since Plaintiff failed to obtain the music licenses as late as February 16, 2001.

2. The Claim that Defendants
Failed to Promote the Film

Paragraph 23(b) of the Amended Agreement is entitled "Future Assurances," and says:

Each of the parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

The Second Amended Complaint provides two examples of Defendants' purported violation of this provision:

35.  . . . [F]ollowing the (albeit untimely) release of the Film in Large Screen Theatrical Format, the band made only one live promotional appearance. During this sole appearance, the Band members deliberately failed to take any action to promote the Film and, indeed, failed to communicate at all with members of the press at the Film's launch in Los Angeles, California.

36.  . . . [T]he Band unreasonably refused for months to allow Plaintiff to link its *NSYNC *Bigger Than Live* website to the official *NSYNC website in order to promote the Film.  When the Band finally agreed, several months after the release of the Film, to permit such link, the positioning on Defendants' website was so inconspicuous as to be virtually meaningless.

In its summary judgment papers, Plaintiff adds more detail, stating that Defendants breached the "Future Assurances" clause by:

failing to take normal and customary steps to promote the Film so as to insure its success. . . . They failed to ever mention the Film, notwithstanding that

-27-

each of them had multiple opportunities to do so.
They failed to ever mention the Film in any of the
hundreds of interviews that they gave to the press
during the time period that the Film was available for
public exhibition; they failed to run a trailer for
the film at their concerts (as they did with virtually
every other film they appeared in), they failed to
permit the Film to be adequately presented on their
website (as they did with virtually every other
project they were involved in), they refused to give
press interviews about the Film, they refused to
appear on *Oprah*, *Entertainment Tonight*, to which they
were invited to discuss the Film[.]

(Pl.'s Opp. Mem. at 14.)  Defendants contend that they were under
no such obligation to promote the film because Paragraph 23(b)
"does not create any new rights or impose new unstated
obligations on the parties beyond those expressly set forth in
the Amended Agreement."  (Defs. Mem. at 12.)  I agree, for the
following reasons.

When quoting the "Future Assurances" clause, Plaintiff uses
an unfair ellipsis that makes the clause seem very broad: "all
acts and things reasonably necessary . . . to carry out the
intent of the parties."  But the missing words are: "in
connection with the performance of their obligations hereunder."
These words limit this clause to obligations set forth in the
contract.

The Original Agreement and the Amended Agreement contain the
same specific provision entitled "Publicity."  In its entirety,
it says:

17.  <u>PUBLICITY</u>: [Plaintiff] agrees that the Band, <u>at
their sole discretion</u>, can make personal appearances at
any venue where the Film is exhibited so long as Band
and [Plaintiff] mutually agree on the amount of
expenses in connection with such personal appearances.
A reasonable number of passes will be made available to
the Band at the venues at which the Band appears.

(Orig. Agreement ¶ 18; Amen. Agreement ¶ 17, emphasis added.)
The record shows that the parties bargained over this specific
provision.  Plaintiff's early draft of the Original Agreement
contained a more expansive paragraph entitled "Publicity," which
would have required the Band to "make appearances at no more than

ten (10) premieres of the Film." (Ritholz Reply Decl., Ex. 2 at ¶ 18.) That provision was explicitly rejected by Defendants' attorney Stuart Kleinman, who crossed it out and returned it on June 6, 2000 with his handwritten comment:

> Not required. If they _elect_ to do personal appearances: expenses in connection therewith will be paid (if [Plaintiff] gives substantial advance notice; it doesn't conflict with their schedule; they are willing to do it at the time; they will consider a premiere or two).

(_Id.,_ emphasis in original.) As a result, the parties agreed to a "Publicity" provision that said "the Band, at their sole discretion . . . ." Moreover, the Original Agreement and the Amended Agreement contain no mention at all of interviews, websites, or television appearances. Given the express wording of the "Publicity" provision, there is no reason to infer that "the intent of the parties" covered the expansive obligations that Plaintiff now asserts.

Plaintiff attempts to create that inference by quoting excerpts from the depositions of the members of the Band, that "the intention of the parties was to do what was necessary to have a successful Film." (Pl.'s Opp. Mem. at 12-14.) For example, Plaintiff quotes the following portion of the deposition transcript of Defendant Timberlake, with my emphasis added:

Q:   Well, you're in the midst of doing a film now; right?
A:   Uh-huh.
Q:   You want that film to succeed, right?
A:   I want everything I do to succeed.
Q:   Right. And in order to make things that you do succeed you need to promote them, don't you?
A:   Sure.

         *              *              *

Q:   Well, would you do things, like, if you were being interviewed on the radio, for example, mention the fact that you have a movie coming out?
A:   Sure.
Q:   Did you ever do that with respect to this film?
A:   I don't remember.
Q:   Okay. And if, oh, for example, "Entertainment Tonight" wanted to do an interview of you in connection with the

```
         film, you would do the interview, right?
A:       If the people that worked for me said it was in my best
         interest, then yes, I would do it.
Witness: You're referring to doing an interview for the IMAX
movie?
Mr. Levine: Right.
Witness: Well, at that time my career revolved around my
involvement in the group, so yes.
Q:       Yes what?
A:       Yes, I would.  Yes, I would do the interview.
Q:       Right.  So if somebody asked you to do an interview on
         "E.T," "Entertainment Tonight," to interview you about
         the IMAX movie, you would have agreed to that, right?
A:       Sure.
Q:       And if someone asked you to appear on "Oprah" -- you
         know what "Oprah" is, right?
A:       I do.
Q:       If someone asked you to appear on "Oprah" for the
         purpose of being interviewed in connection with the
         IMAX film, you would have accepted that?
A:       Sure.
Q:       If someone asked you to spend 18 minutes in an
         interview for -- in connection with the film, you would
         have agreed to do that?
Mr. Waxman: Objection as to form.
Witness: Sure.
```

The objection as to form was well-taken.  The word "someone"
was ambiguous.  Did it mean someone from Wright Management ("the
people that worked for me")?  Or someone from the "Oprah" show?
Or someone from Plaintiff?  Defendant Timberlake had just
testified:  "If the people that worked for me said it was in my
best interest, then yes, I would do it."  In this context, he
made it clear enough that he was interpreting the questions about
"somebody" or "someone" to refer to someone from "the people that
worked for me."  Those people may well persuade Band members to
elect to perform some service to promote or publicize.  This does
not translate into an obligation to Plaintiff, especially where
the "Publicity" provision said that the Band had "sole
discretion."

Even if there had been a contractual provision to promote or
publicize, Plaintiff would still have been required to give
written notice if it felt that there had been a breach.  On that
score, Plaintiff points to nothing except one e-mail Ms. Nelson
wrote to Mr. Ritholz on August 24, 2001 -- more than six months

after the February 2 release and four months after the Band's appearance at the regional premiere in Los Angeles. In this e-mail, she says "[w]e will be in theaters for another year," and she asks why the Band is not giving publicity to the film. She does not assert that the Band was obligated to do so; instead, she appeals to the Band's self-interest: "There's still a huge opportunity to generate revenue for the group." Her e-mail begins as follows:

> We have two theaters in the US that are grossing about $20,000 a week. The theaters are in Detroit and Las Vegas. The reason they are doing so well is that people know the film is there, due to a combination of fan based marketing and theater based marketing. We believe with the slightest help from the group (i.e., a mention here and there in interviews that they do with TV, print, radio, etc.) all the theaters would do this well. When the guys don't mention the film, it makes it seem like they don't like it, endorse it or even care about it. Also, I have been unable to even get the film schedule on NSYNC's website or the record company's websites. We see the trailer running for "ON THE LINE", but not for our movie. I'm sure you know how long 35 mm films stay in theaters, so I thought you might have some insight about why the group and their management don't want to get behind the film. . . .

(Nelson Opp. Decl., Ex. B.) Mr. Ritholz responded with a prompt e-mail:

> Linda, BTL [Bigger Than Live] has been front and center on the FUN STUFF page of our website for weeks. It's there right now with all the theater listings. I just checked again. If you want to supply us with any further theater information we will put it up.
>
> It's not that the guys are not proud of the film. That show and material is now a year and a half old. The guys have moved on creatively, look different and feel differently about what they are doing. They want to emphasize where they are now. We all knew when we went into this that a product like this would have a limited shelf life. The guys did care very much about the film and were hopeful that we would be at this point 9 months ago or more. We are happy for you to exploit the film and hope it is successful, but you

can't expect them to invest a lot of themselves into
this film at this point.  As for the fans only knowing
about it if they fall over it, that responsibility is
squarely on your doorstep.  You have a property
containing the performances of the "biggest band in the
world" according to Rolling Stone.  That should be
enough, combined with money and the right marketing
plan[,] to sell lots of tickets . . .

(Nelson Opp. Decl., Ex. C.)  Apparently, Plaintiff did not
challenge this response, and made no other written claim about
deficient publicity -- until after Plaintiff received the cease-
and-desist letter eight months later.


        3.    The Claim That Defendants Breached the Implied
              Covenant of Good Faith and Fair Dealing

        The final claim of breach alleges that Defendants breached
the implied covenant of good faith and fair dealing.  (Second
Amen. Compl. ¶ 41; Pl.'s Opp. Mem. at 17-18.)  This covenant,
which is implied in every contract governed by New York law,
embraces "any promises which a reasonable person in the position
of the promisee would be justified in understanding were
included." *Rowe v. Great Atlantic & Pacific Tea Co., Inc.,* 46
N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831 (1978).  "[T]he obligation
of good faith cannot be used to create independent obligations
beyond those agreed upon and stated in the express language of
the contract." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354,
359 (S.D.N.Y. 2001).  Plaintiff says that it is not seeking to
impose additional obligations on Defendant.  Instead, Plaintiff
argues that "the obligations that the Defendants were required
to discharge in good faith *already existed* in the Amended
Agreement, *to wit* their obligation to act reasonably in
exercising their approval rights and their obligation to take
such actions (e.g., promoting the Film) as were reasonably
necessary to carry out the intention of the parties."  (Pl.'s
Opp. Mem. at 18, n. 18, emphasis in original.)  However, as
discussed above, Defendants did not have an obligation to
promote the film.  They were obligated to act reasonably in
exercising their approval rights; Plaintiff's evidence does not
remotely show that Defendants failed to discharge that
obligation in good faith.  Accordingly, Defendants did not
breach the implied covenant of good faith and fair dealing.

For all the reasons stated above, I grant summary judgment and dismiss all claims for breaches of contract.

## PLAINTIFF'S CLAIM FOR FRAUD

When ruling on the First Amended Complaint, Judge Wood dismissed the fraud claim and wrote:

> The allegations . . . fall far short of the pleading requirements for a fraud claim.  With respect to defendant's representations made during negotiations, plaintiff fails to allege the identity of the speaker, the date when the alleged misrepresentations were made, and where the statements were made. . . . Plaintiff's fraud claim is therefore dismissed with leave to re-plead in accordance with Fed. R. Civ. P. 9(b).

(3/15/04 Order at 15-16.)

After receiving this rebuke and a last opportunity to comply with Rule 9(b), Plaintiff prepared the Second Amended Complaint.  Its fraud claim made the following allegations:

- "[R]epresentatives of defendant Zeeks including Mr. Wright and Mr. Ritholz specifically represented to Ms. Nelson, Mr. Bolthouse, Mr. Elbert and Mr. Aslanian that it was the intention of the Defendants to act in the best interests of the enterprise so as to maximize profits resulting from the exploitation of the Film and ancillary products." (Second Amen. Compl. ¶ 24.)

- "At no time did any of the [Defendants] advise Plaintiff . . . during their telephone negotiations or in face to face meetings of the following: . . . [t]hat even after the execution of the Amended Agreement they would fail to carry out their approval obligations in a timely manner; . . . [t]hat the Band was about to change and make-over its image; . . . [t]hat . . . [t]he Band's new image created an actual disability, restriction or prohibition which impaired the Band's ability to fully perfo[rm] in accordance with the terms and conditions of the Agreement; . . .  that they would rather see the Film fail than succeed . . . ." (*Id.* ¶ 25(a)-(d).)

- "[I]n late November 2000, the Band . . . failed to disclose . . . their fraudulent intent to delay the ultimate release of the film in order to guarantee the commercial success of their new image at the expense of the Film." (*Id.* ¶ 26.)

- "Defendants fraudulently intended to delay final approvals." (*Id.* ¶¶ 30, 31.)

In its opposition to summary judgment, Plaintiff changes the wording, and also adds a wholly new representation about ancillary rights (DVD, videotape, and television). Plaintiff now says Defendants represented that:

> (i) the members of the band *NSYNC were fully behind the film and would do whatever was necessary to complete the project in time for release during the 2000 holiday season; (ii) Plaintiff would be granted all worldwide ancillary rights concerning the Film, including the right to release the same domestically, the right to release the film in other formats (e.g., DVD and videotape), and the right to release the Film for television broadcast; and (iii) the members of the Band would do whatever was reasonably necessary to make the Film successful.

(Pl.'s Opp. Mem. at 21.)

Plaintiff's second category of representations -- regarding ancillary rights -- must be dismissed out of hand. Despite Judge Wood's clear instructions to plead any representation with particularity, the Second Amended Complaint does not allege that Defendants made any representations about granting ancillary rights. This omission suffices to bar the second category. In any event, to support this unpleaded allegation, Plaintiff merely asserts that Johnny Wright "confirmed that [Plaintiff] would be receiving all ancillary rights worldwide." (Aslanian Decl. ¶ 7; *see also* 3/17/05 Nelson Decl. ¶¶ 26-29.) This testimony is insufficient to overcome the unambiguous terms of the Original Agreement and the Amended Agreement. Neither contract granted any ancillary rights, and this is undisputed. The Amended Agreement (at ¶ 9(c)(iii)) says Plaintiff "may not exhibit, or grant any third-party the right to exhibit, the Film, other than in large format film theaters and in accordance with the terms and conditions contained herein."

Plaintiff's two other categories of representations do not provide the basis for a fraud claim. "[I]ntentionally-false statements . . . indicating [an] intent to perform under the contract [are] . . . not sufficient to support a claim of fraud under New York law." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir. 1996). "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and unrecoverable as contract damages." *Id.* at 20 (citations omitted). Plaintiff argues that the alleged misrepresentations fall under *Bridgestone's* second exception. This argument is unavailing.

The third alleged representation is that "the members of the Band would do whatever was reasonably necessary to make the Film successful." This is merely a restatement of the promise alleged in the second claim for breach of contract. Indeed, Plaintiff concedes that "it could be argued that such obligation is contractual." (Pl.'s Opp. Mem. at 21, n.20.) **[15]**

The remaining alleged representation is that "the members of the band *NSYNC were fully behind the film and would do whatever was necessary to complete the project in time for release during the 2000 holiday season." Plaintiff argues that this allegation is "different than any contractual provision which is claimed to have been breached." (*Id.*) I disagree.

The Defendants's moving brief noted that "there is no date

_____

[15]    Plaintiff argues that there is "an issue of fact as to whether ¶ 23(b) requires the Defendants to engage in reasonable promotion activities. If the jury finds that it does, then the breach of obligation is redressable in contract damages. If the jury finds that it does not, then it is redressable as a misrepresentation." (Pl.'s Opp. Mem. at 21, n.20.) Such alternative pleading cannot salvage Plaintiff's claim for fraud. *See Marriott Int'l Inc. v. Downtown Athletic Club of New York City, Inc.,* 2003 WL 21314056, at *7 n.5 (S.D.N.Y. June 9, 2003) ("It bears noting that Marriott cannot invoke the 'collateral or extraneous' exception by suggesting that it is pleading fraud in the alternative -- i.e., that the fraud claim arises only to the extent that a jury finds that there was no binding contract.").

fixed in the Amended Agreement –– Thanksgiving holiday or
otherwise –– for the Film's first exhibition." (Defs.' Mem. at
10.) In response, Plaintiff engages in what I view as an attempt
to circumvent the holding of *Bridgestone.* Plaintiff says that
Defendants "have completely misconstrued the nature of the breach
of contract claim. . . . the breach of contract claim does <u>not</u>
assert any breach as a result of any contractual requirement to
release the film by any date certain." (Pl.'s Opp. Mem. at 10-
11, *see* especially n. 10, emphasis in original.) Plaintiff then
quotes from Paragraph 16 of the Second Amended Complaint in the
following misleading fashion:

> . . . Defendants, however, thereafter breached the
> Amended Agreement, and their implicit and expressed
> covenant of good faith, by unreasonably and
> fraudulently refusing to take necessary actions, unduly
> delaying issuing necessary approvals, and generally
> acting in their selfish interest at the expense of the
> interests of the enterprise among the parties.

That quotation is misleading because it has omitted the first
sentence of Paragraph 16: "Plaintiff completed the final
production of the Film on September 11, 2000, in <u>sufficient time</u>
<u>for the agreed-upon Thanksgiving Holiday release of the Film</u>."
(emphasis added). This sentence makes clear that Plaintiff's
fraud allegation is a mere duplication of its breach of contract
claim. Plaintiff may not re-write its pleadings in a last-ditch
attempt to argue that its fraud claim is "collateral or
extraneous" to its breach of contract claim. (Moreover, when a
contract claim is barred for failure to give notice of breach, a
plaintiff may not re-write it as a fraud claim.)

However, suppose that I were to take Plaintiff's argument
at face value –– that Plaintiff "does not assert any breach as a
result of any contractual requirement to release the Film by any
date certain." Plaintiff would still try to prove that it
missed a lucrative Thanksgiving or Christmas release because
Defendants delayed approvals. This would be crucial evidence
that might convince a jury that the delay was unreasonable.
True, the evidence of holiday timing would not be determinative
of <u>all</u> of the allegations of unreasonable delays. For example,
if Defendants were reasonable in delaying their approvals prior
to the holiday season, Plaintiff might still be able to show
some injury if it could prove that Defendants were unreasonable
in delaying their approvals after January 1, 2001.
Nevertheless, much of Plaintiff's "reasonableness" argument

would hinge on whether Defendants unreasonably withheld approval of the film prior to January 1, 2001.

Judge Cedarbaum faced a similar situation in *In re 131 Liquidating Corp.*, 2000 WL 1449861 (S.D.N.Y. Sept. 28, 2000). There, 131 Liquidating Corp., a debtor to NatWest, counterclaimed for fraud, alleging that LaSalle Capital Group, Inc. had represented that: it "was a company of substance which had completed [large] transactions;" it "had experience in transactions of the type contemplated;" it "had excellent relationships with prospective sources of . . . debt;" it "knew its potential sources of financing very well;" and it "would be able to close a restructuring transaction within the time constraints imposed by NatWest. . . ." *Id.* at *3. Judge Cedarbaum held that "[t]hese representations do not support a claim for fraud." *Id.* She explained that:

> the representations [131 Liquidating Corp.] points to are essentially representations about LaSalle's ability to complete the transaction on the proposed terms. These representations are not collateral to or extraneous to the Letter of Intent <u>because they are intrinsic to LaSalle's promises</u> to proceed in good faith and to use its best efforts to close a deal on the terms proposed in the Letter of Intent.

*Id.* at *4 (emphasis added). Likewise, in the case at bar, representations about releasing the film by the holiday season would be intrinsic to Defendants' promises not to unreasonably delay approvals for the film. In this situation, New York law bars a fraud claim.

For all the reasons stated above, I grant summary judgment and dismiss Plaintiff's fraud claim.

## <u>PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE</u>

The Second Amended Complaint brought a claim for tortious interference with prospective business relations. Defendants' moving brief stated that: "because all Zeeks did was act to enforce its rights conferred by the Amended Agreement in an entirely proper manner, no claim for tortious interference with prospective economic advantage can be maintained." (Defs.' Mem. at 24.) Plaintiff has offered no argument to the contrary in support of its tortious interference claim. In its moving brief

concerning the counterclaims, Plaintiff states: "Because of the relatively small amount of damages incurred by Plaintiff with respect [to tortious interference,] . . . Plaintiff will not proceed with those claims at trial should Defendants' counterclaims be dismissed by the Court on this summary judgment motion." (Pl.'s Mem. at 7, n.1.) But Plaintiff has not shown that it has a genuine claim for tortious interference. Defendants make the obvious point that they were protecting their contractual rights when they protested to other companies about Plaintiff's assertion that it had the right to license the film for television and DVD. *See Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687, 301 N.Y.S.2d 610, 613 (1969) (holding that plaintiff could not maintain a tortious interference claim against defendant who had merely protected its existing economic interest through legal means). Plaintiff does not counter this point. Accordingly, I grant summary judgment and dismiss Plaintiff's claim for tortious interference.

## <u>DEFENDANTS' COUNTERCLAIMS FOR BREACH OF CONTRACT</u>

One counterclaim originally cited to United States Copyright Law, but the Defendants withdrew it on March 17, 2005. (Defs.' Opp. Mem. at 7.) The remaining counterclaims are based on breach of contract.

In their April 1, 2005 letter, at page 3, Defendants state:

> To the extent the Court dismisses all of plaintiff's claims against defendants, defendants would withdraw all counterclaims to the extent they seek the recovery of monetary damages. The only relief that defendants would seek would be a permanent injunction against plaintiff barring the exploitation and exhibition of the Film by them and persons acting in concert with them, as well as a direction that they account for and turn over all prints of the Film, pursuant to Fed. R. Civ. P. 65, on terms to be determined by the Court.

I have now decided to dismiss all of Plaintiff's claims. Hence, Defendants have withdrawn the counterclaims for monetary damages. I proceed now to consider the counterclaims for injunctive relief.

In seeking summary judgment, Plaintiff assumes "*arguendo*,

-38-

that Plaintiff, in fact breached the amended and restated agreement. . . ." (Pl.'s Mem. at 9.)  Nevertheless, Plaintiff argues:

> Defendants are not entitled to injunctive relief as no continued or repeated threat exists as to any purported illegal exploitation of the Film.  Aside from the fact that there has simply been no prior illegal exploitation of the Film, Defendants can not present any evidence whatsoever that even remotely indicates a risk of future wrongful exploitation of the Film.   To the contrary, the term of exploitation under the original agreement expired in March 2003, and the term of exploitation under the Amended Agreement expired in February or March of 2003.  Indeed, since this action was commenced approximately two and one-half years ago, Plaintiff has not attempted to exploit, nor has it exploited, the Film in any manner and has no intention of dong so.
>
> \*                    \*                    \*
>
> Moreover, Defendants also cannot prove another element for an inunction to issue, *to wit*, irreparable harm. "The threshold required for a party to be entitled to an injunction is clear as *Jackson Dairy*, *supra*, 596 F.2d 70, created an unmistakably clear requirement in this Circuit that movants for equitable relief must show irreparable harm, non-compensable in money damages, in all circumstances in which an injunction is requested.  *Schmidt*, *supra*, 598 F. Supp. at 1539-42." *Iavarone v. Raymond Keyes Associates, Inc.,* 733 F. Supp. 727 (S.D.N.Y. 1990).  Here, even if there was a threat of unauthorized exploitation (which there is not), it is clear that any damages caused by the same could be easily quantified, based on the revenue earned therefrom, that otherwise would have been payable to Defendants.

(Pl.'s Mem. at 10-12, citations and footnotes omitted.)

Defendants counter that the threat of substantial and irreparable harm exists because "there is substantial doubt as to not only [Plaintiff's] intentions, but also to the harm that may result to Zeeks if injunctive relief is precluded." (Defs.' Opp. Mem. at 8.)  Defendants say:

Even more troubling than this, however, is RBFC One's
present inability to account for the whereabouts of the
various prints of the Film previously distributed to
theaters for exhibition. RBFC One insists that it does
not know what happened to the many prints of the Film
that were distributed in the U.S. and overseas. It
cannot explain what became of these prints, who might
have them, where they are now and to what use they
might be put in the future. RBFC One's inability to
state what happened to those prints of the Film and
what those in privity with it did with those prints
weighs heavily in favor of granting Zeeks an injunction
that prohibits not only RBFC One, but those acting in
concert with it in the production and distribution
chain from engaging in any future unauthorized
exploitation of the Film under Fed. R. Civ. P. 65.
Without such relief, defendants will have no protection
should some party that received a print from RBFC One
begin exploiting it hereafter without authorization.
Indeed, in light of RBFC One's failure to gather the
prints, which belong to RBFC One, from its licensees, a
mandatory injunction requiring it do so is appropriate.

(Pl.'s Opp. Mem. at 9, citations omitted; see also Freeman Opp.
Decl. ¶¶ 3, 11, 14-15.) Plaintiff's reply memorandum simply
does not grapple with these issues raised by Defendants.

On this record, I refuse to dismiss the counterclaims for
equitable relief. I will hold a non-jury trial commencing on
May 9, 2005. I will hold a telephone conference on May 2, 2005
at 11:00 A.M. New York time. I direct the attorneys to discuss
all options with each other in at least two telephone
conversations of at least 30 minutes each, prior to April 30,
2005.

Douglas F. Eaton

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, NY 10007
Telephone: 212-805-6175
Fax: 212-805-6181fax

-40-

Dated:     New York, New York
           April 26, 2005

Copies of this Opinion and Order were mailed on this date
to:

Michael Levine, Esq.
Evan S. Zimmerman, P.C.
295 Madison Avenue, Suite 700
New York, NY  10017
(also by fax to 212-791-1454fax)

Farhad Novian, Esq.
Novian & Novian, LLP
1801 Century Park East, Suite 1201
Los Angeles, CA  90067-2326
(also by fax to 310-553-0222fax)

Bruce R. Ewing, Esq.
Helene M. Freeman. Esq.
Seth B. Waxman, Esq.
Dorsey & Whitney LLP
250 Park Avenue
New York, NY  10177-1500
(also by fax to 212-953-7201fax)